**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

STATE OF NEW YORK,

           Plaintiff,

   v.                                 1:25-cv-00087 (AMN/DJS)

UNITEDHEALTHCARE OF NEW YORK, INC.,
OXFORD HEALTH PLANS (NY), INC., and,
OXFORD HEALTH INSURANCE, INC.,

           Defendants.

---

**APPEARANCES:**                            **OF COUNSEL:**

**HON. LETITIA JAMES**             **AMANDA R. STERN, ESQ.**
New York State Attorney General
The Capitol
Albany, New York 12224
*Attorney for Plaintiff*

**DORSEY & WHITNEY LLP**         **NICHOLAS PAPPAS, ESQ.**
51 West 52nd Street                  **JOSHUA R. KORNFIELD, ESQ.**
New York, New York 10019       **JOHN PAUL MIXON, ESQ.**

50 South 6th Street – Suite 1500    **KIRSTEN SCHUBERT, ESQ.**
Minneapolis, Minnesota 55402
*Attorneys for Defendants*

**Hon. Anne M. Nardacci, United States District Judge:**

**MEMORANDUM-DECISION AND ORDER**

## I.     INTRODUCTION

On December 5, 2024, the State of New York ("Plaintiff") commenced this action in New York State Supreme Court, Albany County, against defendants UnitedHealthcare of New York, Inc. ("United"), Oxford Health Plans (NY), Inc., and Oxford Health Insurance, Inc. (together, "Oxford" and, collectively with United, "Defendants"), asserting state law claims in connection

with Defendants' alleged breach of certain contracts between Defendants and a state-owned hospital. Dkt. No. 2 ("Complaint"); Dkt. No. 1 at ¶ 1. On January 16, 2025, Defendants removed this action to federal court on the stated basis that federal question jurisdiction existed because the Employee Retirement Income Security Act of 1984 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, completely preempted Plaintiff's state law claims. Dkt. No. 1.

As relevant here, the state-owned hospital is an "in-network" provider in Defendants' insurance networks. The parties' dispute arises from numerous instances in which the hospital provided fewer than eight hours of a particular healthcare service to an emergency room patient while deciding whether to admit the patient to the hospital. Dkt. No. 45 at 8.[1] Plaintiff seeks reimbursement for these services under two non-insurance contracts between the hospital and Defendants. *See generally* Dkt. No. 2. Defendants contend that the applicable health insurance plans did not cover these services, and thus the hospital is not entitled to payment. *See generally* Dkt. No. 1.

Presently before the Court is Plaintiff's motion to remand this action pursuant to 28 U.S.C. § 1447(c). Dkt. No. 22 ("Motion"); *see also* Dkt. Nos. 45, 47.[2] For the reasons set forth below, the Court grants the Motion, remands the case to New York State Supreme Court, Albany County, and grants Plaintiff's request for just costs and actual expenses, including attorney's fees.

---

[1] Citations to court documents utilize the pagination generated by CM/ECF, the Court's electronic filing system, and not the documents' internal pagination.

[2] Defendants have moved to seal a limited number of documents that contain sensitive patient information and proprietary information, including pricing. Dkt. Nos. 24, 46; *see also* Dkt. Nos. 34-35. The Court finds that Defendants' proposal is narrowly tailored and that the relevant factors weigh in favor of sealing these documents and thus grants the motions. *See generally Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110 (2d Cir. 2006); *see also AngioDynamics, Inc. v. C.R. Bard, Inc.*, No. 17-cv-00598, 2021 WL 776701, at *4 (N.D.N.Y. Mar. 1, 2021); Dkt. No. 46-2. The parties have not sought to seal their discussion of certain limited portions of these documents, nor requested that the Court do so with respect to this opinion.

## II.     BACKGROUND[3]

### A.  The Parties and Relevant Entities

Plaintiff is the State of New York.  Dkt. No. 2 at ¶ 1.  The State University of New York ("SUNY") is a governmental agency and an educational corporation of Plaintiff.  *Id.* at ¶ 2.  Stony Brook University ("SBU") is a member institution of SUNY.  *Id.* at ¶ 3.  Stony Brook University Hospital is an academic medical center that operates a hospital ("SBUH" and, together with SBU, "Stony Brook").  *Id.* at ¶ 4.

Defendants are alleged to be business entities that operate collectively.  *Id.* at ¶¶ 6-10. Defendants contend that they insure or administer various employer-sponsored health insurance plans, at least some of which are governed by ERISA.[4]  Dkt. No. 1 at ¶ 1; Dkt. No. 45 at 7 n.3.

### B.  Relevant Contracts

Defendants and Stony Brook contracted for Stony Brook to serve as an in-network healthcare provider for Defendants' insureds.  Dkt. No. 2 at ¶¶ 11, 13.  At a high level, Stony Brook would provide certain medical services to Defendants' insureds, and Defendants would reimburse Stony Brook at agreed rates for such services.  *See, e.g., id.* at ¶ 15 ("Pursuant to the terms and conditions set forth in the United Contract and the Oxford Contract . . . , the Defendants are obligated to reimburse Stony Brook for covered medical services and treatment that Stony Brook provides to the Defendants' insureds."); Dkt. No. 45 at 6 ("SBUH provided services

---

[3] The following facts are drawn from the Complaint unless otherwise noted and are assumed to be true for purposes of ruling on the Motion. *Winnie v. Sinagra*, No. 24-cv-940, 2024 WL 4534054, at *2 (N.D.N.Y. Oct. 21, 2024) ("When considering a motion to remand, the district court accepts as true all relevant allegations contained in the complaint and construes all factual ambiguities in favor of the plaintiff.") (citation omitted).

[4] For convenience, the Court refers to individuals insured under such plans simply as Defendants' insureds, instead of beneficiaries, participants, members, customers, etc., of employer-sponsored health insurance plans that are insured or administered by Defendants.  Dkt. No. 45 at 7 n.3.

pursuant to network participation agreements with agreed rates for particular services."); *see also Montefiore Med. Ctr. v. Teamsters Loc. 272*, 642 F.3d 321, 326 n.4 (2d Cir. 2011) ("A Preferred Provider Organization is 'an entity that contracts with doctors, hospitals, and other health care providers to arrange discounted payments for services for the PPO's customers.' In other words, health care providers in a PPO's 'network' agree to charge discounted rates for their services, and, in exchange, the insurance plans affiliated with the PPO encourage their members (typically by discounting the member's own payment obligations) to patronize providers within the network.") (quoting *United States v. Graf,* 610 F.3d 1148, 1154 (9th Cir. 2010)); *Rojas v. Cigna Health & Life Ins.*, 793 F.3d 253, 254-55 (2d Cir. 2015) ("[Plaintiff] is an in-network provider with [Cigna]. Cigna insureds use Cigna's coverage to pay their bills when they receive medical services from [plaintiff]; in exchange, [plaintiff] accepts reduced reimbursement rates.").

More specifically, United and Stony Brook entered into a network participation agreement, effective May 1, 2007, for Stony Brook to provide medical services to United's insureds (as amended, renewed, extended, and appended, the "United Contract"). Dkt. No. 2 at ¶¶ 11-12; *see also* Dkt. No. 45 at 7-8. Likewise, Oxford and Stony Brook entered into a network participation agreement, dated July 3, 2002, for Stony Brook to provide medical services to Oxford's insureds (as amended, renewed, extended, and appended, the "Oxford Contract"). Dkt. No. 2 at ¶¶ 13-14; *see also* Dkt. No. 45 at 7-8.

Plaintiff alleges that pursuant to the terms of the United Contract and the Oxford Contract (together, the "Contracts"), Defendants are obligated to reimburse Stony Brook for certain medical services that Stony Brook provides to Defendants' insureds. Dkt. No. 2 at ¶ 15. According to Plaintiff, the Contracts establish which medical services are reimbursable and set the amounts Defendants will reimburse Stony Brook for these services. *Id.* at ¶ 16.

Plaintiff further alleges that "Observation" is one of the reimbursable services under the Contracts. *Id.* at ¶¶ 19-20.  Defendants explain that "'Observation' refers to the observation and assessment that an emergency room provider furnishes to a patient while deciding whether to admit the patient to the hospital." Dkt. No. 45 at 8 (citation omitted).  Plaintiff contends that the Contracts obligate Defendants to reimburse Stony Brook for Observation services, regardless of the length of an insured's stay.  Dkt. No. 2 at ¶¶ 23-24.

Under the United Contract, Plaintiff alleges that Observation is defined as:

Services furnished by [Stony Brook] at [Stony Brook]'s premises, regardless of the length of stay, including use of a bed and periodic monitoring by [Stony Brook]'s nursing or other staff, which are reasonable and necessary to evaluate an outpatient condition or determine the need for a possible Admission to [Stony Brook] as an inpatient.

*Id.* at ¶ 21 (alterations in original) (citation omitted).  Under the Oxford Contract, Plaintiff alleges that Observation is defined as:

Services furnished by [Stony Brook] on . . . [Stony Brook]'s premises, regardless of the length of stay, including use of a bed and periodic monitoring by [Stony Brook]'s nursing or other staff, which are reasonable and necessary to evaluate an outpatient condition or determine the need for a possible Admission to [Stony Brook] as an inpatient.

*Id.* at ¶ 22 (alterations in original) (citation omitted).

The Contracts also contain various provisions concerning Stony Brook's ability to seek reimbursement from both Defendants and Defendants' insureds.

As to Defendants, Section 6.5 of the United Contract, entitled "Denial of claims for not following Protocols or not filing timely[,]" states in pertinent part that "Payment to [Stony Brook] may be denied if [Stony Brook] does not comply with the Protocols or does not file a timely claim[.]" Dkt. No. 47-10 at 11, § 6.5.  Section 3 of the Oxford Contract, entitled "Payment Policies / Financial Responsibility for Services," contains similar provisions.  *See* Dkt. No. 47-11 at 3-4,

§§ 3.2, 3.4.

As to Defendants' insureds, Section 6.7 of the United Contract, entitled "Payment under

this Agreement is payment in full[,]" states that

> [Stony Brook] will not seek to recover, bring a collection action against, assert [a] lien against, or accept any payment from Customer . . . in excess of payment in full as provided in this Section 6.7, regardless of whether such amount is less than [Stony Brook]'s billed charge or customary charge. This Section 6.7 will apply regardless of whether Customer or anyone purporting to act on Customer's behalf has executed a waiver or other document of any kind purporting to allow [Stony Brook] to collect such payment from Customer.

Dkt. No. 47-10 at 10-11, § 6.7. And Section 6.8 of the United Contract, entitled "Customer 'Hold

Harmless'[,]" states in pertinent part that:

> [Stony Brook] will not bill or collect payment from the Customer, or seek to impose a lien, for the difference between the amount paid under this Agreement and [Stony Brook]'s billed charge or Customary Charge, or for any amounts denied or not paid under this Agreement due to:
>
> i) [Stony Brook]'s failure to comply with the Protocols; or
> ii) [Stony Brook]'s failure to file a timely claim; or
> iii) Payer's Payment Policies; or
> iv) inaccurate or incorrect claim processing; or
> v) insolvency or other failure by Payer to maintain its obligation to fund claims payments, if Payer is United or is an entity required by applicable law to assure that its Customers not be billed in such circumstances.
>
> This obligation to refrain from billing Customers applies even in those cases in which [Stony Brook] believes that United or Payer has made an incorrect determination. In such cases, [Stony Brook] may pursue remedies under this Agreement against United or Payer, as applicable, but must still hold the Customer harmless.

Dkt. No. 47-10 at 12, § 6.8. The Oxford Contract also contains provisions concerning the ability

of Stony Brook to seek payment from Oxford's insureds. *See, e.g.,* Dkt. No. 47-11 at 3, § 3.1

("[Stony Brook] shall seek payment . . . only from Oxford . . . and in no event, including but not

limited to nonpayment by Oxford[,] insolvency of Oxford[,] or breach of this Agreement by

Oxford, may [Stony Brook] bill, charge, collect a deposit from, or otherwise seek compensation

6

or remuneration or have recourse against a Member, a Member's family or any persons acting on behalf of the member, for services provided pursuant to this Agreement.").

### C. Relevant Alleged Events

Plaintiff alleges that, prior to November 30, 2020, Stony Brook provided Observation services to Defendants' insureds and received corresponding reimbursement from Defendants, regardless of the duration of Observation services. Dkt. No. 2 at ¶ 27. Beginning on or about November 30, 2020, however, Defendants allegedly stopped reimbursing Stony Brook for Observation services with a duration of less than eight hours. *Id.* at ¶ 28.

Plaintiff contends that this change was the result of a policy decision by Defendants, taken in contravention of the Contracts. *Id.* at ¶ 29. Defendants have submitted a document entitled "Outpatient Hospital Observation Policy, Facility[.]" Dkt. No. 45-26 (the "Policy"). The Policy's "History" section indicates that it was first "implemented" on October 1, 2020, after being "approved by [the] Reimbursement Policy Oversight Committee" on June 25, 2020. *Id.* at 5. The Policy states in pertinent part:

> **IMPORTANT NOTE ABOUT THIS REIMBURSEMENT POLICY**
>
> *. . . . This reimbursement policy is intended to ensure that you are reimbursed based on the code or codes that correctly describe the health care services provided. . . .*
>
> *. . . .*
>
> **Policy**
>
> **Overview**
>
>> Observation care is a well-defined set of specific, clinically appropriate services, which include ongoing short term treatment, assessment, and reassessment, that are furnished while a decision is being made regarding whether patients will require further treatment as hospital inpatients or if they are able to be discharged from the hospital. Observation services are commonly ordered for patients who present to the emergency department and who then require a significant period of treatment or monitoring in order

to make a decision concerning their admission or discharge.

. . . .

**Reimbursement Guidelines**

. . . .

Observation services must be reported by facilities utilizing the following guidelines:
- Observation services are submitted with type of bill 13X, 78X, or 85X.
- Report HCPCS code G0378 (hospital observation service, per hour) under the appropriate revenue code (0762) with units that represent the hours in observation care (rounded to the nearest hour).
- Observation service code G0378 will only be considered for reimbursement when the observation period meets or exceeds 8 hours.

. . . .

**Questions and Answers**

. . . .

**Q:** How would I report the appropriate hours/units when an observation service started at 10:15 AM and ended at 6:52 PM on the same day?

**A:** It would be appropriate to round to the nearest hour, so in this example you would round the start time to 10:00 AM and the end time to 7:00 PM. That would equate to 9 hours/units of observation services that can be reported.

*Id.* at 2, 3, 4.

Plaintiff provided notice of its objection to the alleged policy decision by Defendants through correspondence dated April 4, 2023. Dkt. No. 22-1 at 2-3, ¶ 6(b). This correspondence states in pertinent part that "United and Oxford (collectively the 'carriers') have refused to pay for observation services rendered by [Stony Brook] to its patients for periods of less than eight hours submitted between November 30, 2020 and the present. This ongoing practice breaches the existing cont[r]acts between [Stony Brook] and both carriers." *Id.* at 116. Defendants responded by correspondence dated June 1, 2023. *Id.* at 2-3, ¶ 6(c). This correspondence states in pertinent

8

part that:

> We recently received your correspondence on behalf of Stony Brook University Hospital dated April 4, 2023, about our Facility Outpatient Hospital Policy, which is the first time we were Notified of Stony Brook disputing the policy. Thank you for taking the time to contact us. We appreciate the chance to share more information with you.
>
> To help reinforce accurate coding practices and to align with the Centers for Medicare and Medicaid Services ("CMS") coding guidance, effective for dates of service on or after October 1, 2020, UnitedHealthcare implemented a Payment Policy for UnitedHealthcare commercial plans entitled "Outpatient Hospital Observation Policy, Facility" (the "Observation Policy"). Claims for observation that do not align with the Observation Policy will be denied. The Provider has the option to resubmit the denied claim according to the terms of the Facility Participation Agreement between us (the 'Agreement')[.]
>
> There is no direct conflict between the Observation Policy and the Agreement's Payment Appendices. The Observation Policy operates in conjunction with the terms set forth in the Agreement and its Payment Appendixes. With the implementation of the Observation Policy, UnitedHealthcare is adopting certain CMS coding guidelines related to observation services, including that observation service code GO378 will only be considered for reimbursement when the observation period meets or exceeds 8 hours. As CMS indicates, the number of units reported with code GO378 must equal or exceed 8 hours. Otherwise, the services rendered do not meet the criteria for reimbursement of observation services pursuant to CMS guidelines. Denials of claims that don't meet the 8-hour requirement are consistent with Stony Brook's Agreement and applicable Payment Appendices, as well as support existing contractual obligations to code claims correctly.

*Id.* at 121.

Plaintiff alleges that on or about September 19, 2024, Defendants partially reversed the Policy and agreed to resume reimbursing Stony Brook for Observation services with a duration of less than eight hours rendered between December 15, 2023 and December 15, 2026. Dkt. No. 2 at ¶ 30. Plaintiff submits an email dated September 20, 2024, from a representative of Defendants, which states:

> [This email is] to confirm that, between December 15, 2023 and December 15, 2026, Stony Brook [ ] will not be subject to the eight-hour requirement with respect to the following Payment Policy: Outpatient Hospital Observation Policy, Facility.

9

Claims that have previously been processed as subject to this requirement shall be reprocessed[.]

Dkt. No. 22-2 at 13; *see also id.* at 4-5, ¶ 13. The "History" section of the Policy submitted by Defendants indicates that the Policy changed on September 22, 2024. Dkt. No. 45-26 at 5.

According to Plaintiff, more than 500 of Stony Brook's claims for reimbursement, for Observation services with a duration of less than eight hours rendered from November 30, 2020 through December 14, 2023, remain unpaid by Defendants. Dkt. No. 2 at ¶ 31; *see also* Dkt. No. 22-2 at 5, ¶ 14. Plaintiff alleges that payment has been demanded from Defendants for these services, but that the unpaid claims for reimbursement total $4,079,387.03. Dkt. No. 2 at ¶ 32.

### D. Plaintiff's Legal Claims

Based on these factual allegations, Plaintiff asserts four state law claims: (i) breach of the Contracts, *id.* at ¶¶ 33-39; (ii) unjust enrichment, *id.* at ¶¶ 40-45; (iii) declaratory judgment pursuant to N.Y. C.P.L.R. § 3001, *id.* at ¶¶ 46-51; and (iv) interest and collection fees in connection with a debt owed to New York State pursuant to N.Y. State Fin. Law § 18, *id.* at ¶¶ 52-56.

### E. Procedural History

On December 5, 2024, Plaintiff commenced this action in New York State Supreme Court, Albany County ("State Court"). Dkt. No. 2. On December 17, 2024, Plaintiff effected service on Defendants. Dkt. No. 1-1 at 15-17. On January 16, 2025, Defendants filed a joint notice of removal. Dkt. No. 1 ("Notice"). Following several Court-approved extensions of time for Defendants to respond to the Complaint, Dkt. Nos. 11, 16, 21, Plaintiff moved to remand the case on April 29, 2025, Dkt. No. 22, and Defendants moved to dismiss the Complaint on May 2, 2025, Dkt. No. 25.

In response to Plaintiff's Motion, Defendants requested the opportunity to conduct jurisdictional discovery. Dkt. No. 26. Defendants proposed that each side select ten insureds with

at-issue claims, and then produce certain documentation in connection with the resulting twenty claims. *Id.* at 3-4, 5. Plaintiff opposed this request as unnecessary. *See generally* Dkt. No. 29. Plaintiff contended that Defendants had not satisfied any of the multiple requirements for federal subject matter jurisdiction in this particular case, *see infra* Section IV.B, and that discovery would not remedy this deficiency. Dkt. No. 29 at 2-3. After hearing from the parties, United States Magistrate Judge Daniel J. Stewart granted Defendants' request. Dkt. No. 38. In discovery, Defendants produced documentation relating to the ERISA plans for the twenty insureds, while Plaintiff produced documentation relating to claims and assignments for these same individuals. *See, e.g.,* Dkt. No. 45 at 19; Dkt. No. 47-1 at ¶ 5. Following the completion of this discovery in September 2025, the parties fully briefed the Motion. Dkt. Nos. 43-45, 47.

## III.    STANDARD OF REVIEW

In general, "any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants, to the district court of the United States for the district and division embracing the place where such action is pending." 28 U.S.C. § 1441(a); *see also Link Motion Inc. v. DLA Piper LLP*, 103 F.4th 905, 912 (2d Cir. 2024). A district court's original jurisdiction includes "all civil actions arising under the Constitution, laws, or treaties of the United States," 28 U.S.C. § 1331, and "all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between . . . citizens of different States[,]" 28 U.S.C. § 1332(a)(1). The party seeking removal must establish federal jurisdiction. *See, e.g., Platinum-Montaur Life Scis., LLC v. Navidea Biopharms., Inc.*, 943 F.3d 613, 617 (2d Cir. 2019) ("'It is well-settled that the party asserting federal jurisdiction bears the burden of establishing jurisdiction,' and it must prove jurisdiction by a 'preponderance of evidence.'") (first quoting *Blockbuster, Inc. v. Galeno*, 472

F.3d 53, 57 (2d Cir. 2006); and then quoting *Liranzo v. United States*, 690 F.3d 78, 84 (2d Cir. 2012)).

The removing party must also comply with procedural requirements set forth in statute. *See Link Motion Inc.*, 103 F.4th at 911-12 (stating that federal courts are "mindful that (1) the removing party . . . 'bears the burden of demonstrating the propriety of removal,' (2) 'statutory procedures for removal are to be strictly construed'; and (3) we must 'resolve any doubts against removability'") (first quoting *O'Donnell v. AXA Equitable Life Ins. Co.*, 887 F.3d 124, 128 (2d Cir. 2018); and then quoting *Taylor v. Medtronic, Inc.*, 15 F.4th 148, 150 (2d Cir. 2021)). These requirements include filing a notice of removal "containing a short and plain statement of the grounds for removal, together with a copy of all process, pleadings, and orders served upon such defendant or defendants in such action." 28 U.S.C. § 1446(a); *see also* 28 U.S.C. § 1446(d). "The general removal statute delineates two 30-day periods during which removal may occur." *Cutrone v. Mortg. Elec. Registration Sys., Inc.*, 749 F.3d 137, 142 (2d Cir. 2014) (citing 28 U.S.C. § 1446(b)).

A party who opposes removal may move to remand the case back to state court. *See, e.g., Shapiro v. Logistec USA, Inc.*, 412 F.3d 307, 310 (2d Cir. 2005). "A motion to remand the case on the basis of any defect other than lack of subject matter jurisdiction must be made within 30 days after the filing of the notice of removal[.]" 28 U.S.C. § 1447(c). As for subject matter jurisdiction, "[i]f at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded." *Id.*; *see also Platinum-Montaur*, 943 F.3d at 616 ("'It is a fundamental precept that federal courts are courts of limited jurisdiction' and lack the power to disregard such limits as have been imposed by the Constitution or Congress.") (quoting *Durant, Nichols, Houston, Hodgson & Cortese-Costa P.C. v. Dupont*, 565 F.3d 56, 62 (2d Cir.

12

2009)).  Finally, "[o]n a motion to remand, the party seeking to sustain the removal, not the party seeking remand, bears the burden of demonstrating that removal was proper."  *Hodges v. Demchuk*, 866 F. Supp. 730, 732 (S.D.N.Y. 1994) (Sotomayor, J.) (citations omitted).

## IV.    DISCUSSION

### A.  Procedural Requirements

Defendants contend that they timely and jointly filed the Notice within thirty days of service and included therein copies of all pleadings and process served in State Court.  Dkt. No. 1 at 1 & ¶¶ 29-31; *see also* 28 U.S.C. § 1446(b); *Pietrangelo v. Alvas Corp.*, 686 F.3d 62, 66 (2d Cir. 2012).  Plaintiff does not argue that Defendants failed to satisfy these or any other procedural requirement for removal.  *See generally* Dkt. No. 22-3.  The Court therefore finds that there is no procedural bar to removal.

### B.  Subject Matter Jurisdiction

Defendants assert that original jurisdiction exists because Plaintiff's state law claims arise from at least some health insurance plans governed by ERISA, and are thus completely preempted by federal law.  *See generally* Dkt. No. 1.  Plaintiff contends that this Court lacks jurisdiction because Plaintiff's state law claims instead relate to the Contracts and are not completely preempted by ERISA.  *See generally* Dkt. No. 22-3.

In general, "the determination of jurisdiction is based only on the allegations in the plaintiff's 'well-pleaded complaint'—not on any issue the defendant may raise."  *Royal Canin U.S.A., Inc. v. Wullschleger*, 604 U.S. 22, 26 (2025) (citation omitted).  As a result, "a defendant may not ordinarily 'remove a case to federal court unless the plaintiff's complaint establishes that the case arises under federal law[.]'"  *Trs. of N.Y. State Nurses Ass'n Pension Plan v. White Oak Glob. Advisors, LLC*, 102 F.4th 572, 605 (2d Cir. 2024) (quoting *Aetna Health Inc. v. Davila*, 542

13

U.S. 200, 207 (2004)).  However, a "'corollary of the well-pleaded complaint rule' provides that 'Congress may so completely pre-empt a particular area [of law] that any civil complaint raising this select group of claims is necessarily federal in character.'"  *Montefiore*, 642 F.3d at 327 (alteration in original) (first quoting *Metro. Life Ins. Co. v. Taylor*, 481 U.S. 58, 63-64 (1987); and then citing *In re WTC Disaster Site*, 414 F.3d 352, 372-73 (2d Cir. 2005)); *see also City of New York v. Exxon Mobil Corp.*, 154 F.4th 36, 41 (2d Cir. 2025) (discussing exceptions to the well-pleaded complaint rule).  When applicable, "complete preemption permits removal where a federal statute 'wholly displaces the state-law cause of action,' such that the claim, 'even if pleaded in terms of state law, is in reality based on federal law.'"  *White Oak*, 102 F.4th at 605 (quoting *Davila*, 542 U.S. at 207-08).

As the Supreme Court and Second Circuit have made clear, "the ERISA civil enforcement mechanism is one of those provisions with such extraordinary pre-emptive power that . . . causes of action within the scope of the civil enforcement provisions of [ERISA] § 502(a) are removable to federal court under the complete preemption doctrine."  *Id.* at 606 (alterations in original) (quotations omitted) (quoting *Davila*, 542 U.S. at 209).  Under the test established by the Supreme Court in *Davila*, a "suit falls 'within the scope of' ERISA § 502(a)(1)(B). . . . [1] if an individual, at some point in time, could have brought his claim under ERISA § 502(a)(1)(B), and [2] where these is no other independent legal duty that is implicated by a defendant's actions[.]"  *Davila*, 542 U.S. at 210 (quoting *Metro. Life*, 481 U.S. at 66); *see also White Oak*, 102 F.4th at 606 n.18.  Because the *Davila* test is conjunctive, state law claims are completely preempted only if both prongs are satisfied.  *See, e.g., Wurtz v. Rawlings Co., LLC*, 761 F.3d 232, 241 (2d Cir. 2014).

### 1.  *Davila* Prong One

The Second Circuit has disaggregated the first prong of the *Davila* test to consider "(1)

whether the plaintiff is the *type* of party that can bring a claim pursuant to § 502(a)(1)(B) and also (2) whether the *actual claim* that the plaintiff asserts can be construed as a colorable claim for benefits pursuant to § 502(a)(1)(B)." *McCulloch Orthopaedic Surgical Servs., PLLC v. Aetna Inc.*, 857 F.3d 141, 146 (2d Cir. 2017) (quoting *Montefiore*, 642 F.3d at 328). "Pursuant to ERISA § 502(a)(1)(B), [1] a participant or beneficiary may bring an action [2] 'to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan.'" *Id.* at 145 (citation omitted).

### a. Prong One, Part One – Type of Party

With respect to whether Stony Brook, as a healthcare provider, is the type of party that can bring an ERISA claim, the parties do not dispute that Stony Brook is neither a participant nor a beneficiary. *See, e.g.,* Dkt. No. 22-3 at 12-13; Dkt. No. 45 at 16-17; *Rojas*, 793 F.3d at 256, 257 ("As relevant here, Section 502 is narrowly construed to authorize only two categories of persons to sue directly to enforce their rights under the plan: participants and beneficiaries. . . . 'Beneficiary,' as it is used in ERISA, does not without more encompass healthcare providers.") (citations omitted).

Defendants instead contend that Stony Brook has "derivative standing," Dkt. No. 1 at ¶ 18, under a narrow exception articulated by the Second Circuit. *See, e.g., McCulloch*, 857 F.3d at 146 ("Although § 502(a) is narrowly construed to permit only the enumerated parties to sue directly for relief, we have carv[ed] out a narrow exception to the ERISA standing requirements to grant standing to healthcare providers to whom a beneficiary has assigned his claim in exchange for health care.") (alteration in original) (quotations omitted) (quoting *Montefiore*, 642 F.3d at 329); *see also Am. Psychiatric Ass'n v. Anthem Health Plans, Inc.*, 821 F.3d 352, 361 (2d Cir. 2016) ("[W]e have allowed physicians to bring claims under § 502(a) based on a valid assignment from

15

a patient.  However, '[t]his narrow exception grants standing only to healthcare providers to whom a beneficiary has assigned his claim in exchange for health care benefits.'") (second alteration in original) (citations omitted).

Defendants asserted in the Notice that various of their insureds assigned ERISA claims to Stony Brook in exchange for healthcare services, Dkt. No. 1 at ¶¶ 11-12, 19, and that these insureds "were contractually permitted to assign" their claims to Stony Brook, *id.* at ¶ 20.  Plaintiff's Motion argues that the Notice identifies only a single insured and that Defendants have failed to establish that any such assignment was valid.  Dkt. No. 22-3 at 14-15.  Defendants respond that the jurisdictional discovery the parties undertook establishes that removal is proper.  Dkt. No. 45 at 19-20; *see also* Section II.E.

According to Defendants, ten of the twenty insureds selected by the parties sought to assign their claims and the applicable ERISA plans ("Plans") did not prohibit the insureds' assignment.[5]  Dkt. No. 45 at 19; *see also* Dkt. No. 45-24; *Montefiore*, 642 F.3d at 331 n.11 ("[W]e need only locate a single preempted claim to establish a basis for the exercise of federal subject matter jurisdiction.").

To support this contention, Defendants have submitted (i) excerpts of materials purporting to reflect assignments by Defendants' insureds to Stony Brook, and (ii) excerpts of materials relating to the ten Plans.  *See, e.g.,* Dkt. No. 45-24 (summary of excerpts relating to nine of ten Plans); Dkt. Nos. 45-8, 45-18, 45-33 (excerpts relating to tenth Plan).  Even if the former excerpts establish that all ten insureds purported to assign ERISA claims to Stony Brook in exchange for

---

[5] Defendants concede that the applicable ERISA plans for nine additional insureds prohibited such assignment.  Dkt. No. 45 at 19 (stating that even though "19 exemplar members assigned their ERISA" claims to Stony Brook, "for ten claims, the applicable benefit plans did not prohibit the members' assignment"); *see also* Dkt. No. 47-1 at ¶ 5; *McCulloch*, 857 F.3d at 148.

healthcare benefits, the latter excerpts fail to establish that any such assignment was valid under the Plans. *See, e.g., McCulloch*, 857 F.3d at 148 ("'[A]bsent a *valid* assignment of a claim, . . . . non-enumerated parties lack statutory standing to bring suit under [ERISA] even if they have a direct stake in the outcome of the litigation.' . . . [W]hile the patient attempted to assign [the provider] the right to payment for the surgeries that [the provider] performed, this assignment was prohibited under the terms of the patient's health care plan. [As a result,] Aetna . . . has failed to establish that [the provider] is the 'type of party' who may bring claims pursuant to § 502(a)(1)(B).") (second and third alterations in original) (quoting *Connecticut v. Physicians Health Servs. of Conn., Inc.*, 857 F.3d 141, 148 (2d Cir. 2002); and then citing *Am. Psychiatric*, 821 F.3d at 361).

As detailed below, Defendants do not appear to have submitted complete documents, the relevant documents, or even excerpts from the versions of documents applicable at the time of the parties' dispute. Moreover, the excerpts Defendants have submitted either contradict or do not support a number of Defendants' characterizations.

For example, in both the Notice and Defendants' opposition to the Motion, Defendants claim to have submitted the Plans themselves. *See, e.g.,* Dkt. No. 1 at ¶ 11 (stating that "several of these Customer Benefit Plans are in fact ERISA-governed benefit plans ('ERISA Plans'). A sample such an [sic] ERISA Plan is attached as Exhibit A"); Dkt. No. 45 at 10 ("The plans submitted in support of this Opposition Brief demonstrate that . . . ."); Dkt. No. 45-24 at 1 (appendix detailing "Benefit Plan[s] and Relevant Terms"). But the excerpts Defendants have submitted do not support their claim.

The excerpts relating to nine of the ten Plans are drawn only from so-called summary plan descriptions (each, an "SPD"). *See* Dkt. No. 45-24 at 2-8, 10; Dkt. Nos. 45-29, 45-30, 45-31, 45-

17

32, 45-33, 45-34, 45-35, 45-36, 45-37.  Defendants have not established that these SPDs constitute the terms of the underlying ERISA plan.  *See, e.g., CIGNA Corp. v. Amara*, 563 U.S. 421, 438 (2011) ("[W]e conclude that the summary documents, important as they are, provide communication with beneficiaries *about* the plan, but that their statements do not constitute the *terms* of the plan for purposes of § 502(a)(1)(B)."); *Tocker v. Philip Morris Cos., Inc.*, 470 F.3d 481, 488 (2d Cir. 2006) (observing that "the summary plan description is intended to be a summary, not a full recitation of the terms of the plan") (citation omitted); *cf. Nathaniel L. Tindel, M.D., LLC v. Excellus Blue Cross Blue Shield*, No. 22-cv-971, 2023 WL 3318489, at *2-3 (N.D.N.Y. May 9, 2023) (declining to consider SPD given dispute regarding terms of underlying ERISA plan).  Indeed, various SPD excerpts submitted by Defendants indicate that *other* documents govern the terms of the Plan.  *See, e.g.,* Dkt. No. 45-29 at 6 ("This [SPD] represents an overview of your Benefits.  In the event there is a discrepancy between the SPD and the official plan document, the plan document will govern."); Dkt. No. 45-34 at 6 (same); Dkt. No. 45-30 at 6 (stating that an insured's ERISA rights include the right to obtain "copies of documents governing the operation of the Plan, including" documents other than the SPD); Dkt. No. 45-35 at 10 (stating that an insured's ERISA rights include the right to "obtain copies of all Plan documents and other Plan information, including" documents other than the SPD).[6]  And Defendants have not submitted any of these other documents for the nine Plans.

For the tenth Plan, Defendants do not rely on an SPD.  Instead, Defendants submit excerpts from a different document, one that again references various other documents that Defendants have not provided.  Dkt. No. 45-38 at 3 ("This *Certificate of Coverage (Certificate)* is part of the

---

[6] Other SPD excerpts provided by Defendants do not appear to include provisions addressing which documents govern the Plan.  *See, e.g.,* Dkt. Nos. 45-31, 45-32.

Policy. . . . In addition to this *Certificate*, the Policy includes: [ ] The *Schedule of Benefits*. [ ] The Group's *Application*. [ ] Riders, including the *Outpatient Drug Rider*. [ ] Amendments."); *id.* at 9 (right to obtain "copies of documents governing the operation of the plan, including" documents other than the certificate of coverage).

Notably, Plaintiff indicates that Defendants produced in jurisdictional discovery the underlying documents for a number of other Plans. Dkt. No. 47-1 at ¶¶ 7-9. As Plaintiff notes, *id.* at ¶ 10, each of these underlying documents contains express anti-assignment provisions. *See, e.g.,* Dkt. No. 47-4 at 2 ("Enclosed is an original copy of your Group Policy, which outlines the plan design specifics and the terms and conditions for your Oxford product coverage."); *id.* at 3 (listing "General Provisions," including an anti-assignment provision); Dkt. No. 47-5 at 2, 3 (same); Dkt. No. 47-6 at 2, 3 (same). In contrast, Defendants have not submitted a "Group Policy" document for any of the ten Plans on which they rely. *See* Dkt. Nos. 45-29, 45-30, 45-31, 45-32, 45-33, 45-34, 45-35, 45-36, 45-37, 45-38. For all of these reasons, the Court finds that Defendants have not established that the documents they have excerpted govern, or contain the relevant terms, for the ten Plans on which they rely.

Even if Defendants had established this, Defendants have still failed to support the assertion in the Notice that they have derivative standing because their insureds were contractually permitted to assign their benefits to Stony Brook. Dkt. No. 1 at ¶¶ 19-20. Tellingly, Defendants no longer argue that the excerpted language they submit explicitly permits such assignment. Instead, Defendants now argue that the excerpted language does not prohibit such assignment. *See, e.g.,* Dkt. No. 45 at 19 (arguing that, "for ten exemplar claims, the applicable benefits plans did not prohibit the [insureds]' assignments" to Stony Brook); *id.* at 20 (arguing that, for these ten Plans, "[n]one prohibit assignment to an in-network provider") (citations omitted). But

Defendants have also failed to support that assertion.

Foremost, the excerpts that Defendants have submitted are very limited, and seemingly inconsistent, portions of much larger documents. *See, e.g.,* Dkt. No. 45-29 (twelve-page excerpt of document with pagination indicating at least 152 pages); Dkt. No. 45-37 (seven-page excerpt of document with pagination indicating at least 152 pages); Dkt. No. 45-36 (nine-page excerpt of document with pagination indicating at least 116 pages); Dkt. No. 45-35 (nine-page excerpt of document with pagination indicating at least 164 pages); Dkt. No. 45-38 (ten-page excerpt of document with pagination indicating at least 76 pages). As noted earlier, even these limited excerpts make clear that other documents govern the Plans. As a result, the Court cannot conclude that the hundreds of pages Defendants have not provided contain no provisions relevant to analyzing the validity of assignment to an in-network provider.

That is in large part because Defendants appear to misread at least one of the limited excerpts that they do provide.[7] In their appendix detailing "Benefit Plan[s] and Relevant Terms,"

---

[7] There are additional reasons that the Court finds Defendants' position unsupported by the documents they have submitted. *See also infra* n.8; *infra* Section IV.C. For example, it appears that for half of the Plans on which they rely, Defendants have submitted excerpts relating to years during which Stony Brook is not seeking reimbursement for its provision of Observation services to the corresponding insured, including excerpts from one SPD dated more than a decade ago. *See generally* Dkt. No. 45-24; *compare* Dkt. No. 45-30 at 2-9 (SPD dated "January 1, 2015"), *with* Dkt. No. 45-9 at 3 (indicating corresponding insured received Observation services from Stony Brook in January 2021); *compare* Dkt. No. 45-29 at 2 (SPD stating "Effective: January 1, 2020"), *with* Dkt. No. 45-7 at 3 (indicating corresponding insured received Observation services from Stony Brook in February 2021); *compare* Dkt. No. 45-32 at 2 (SPD stating "Effective: January 1, 2020"), *with* Dkt. No. 45-4 at 3 (indicating corresponding insured received Observation services from Stony Brook in July 2021); *compare* Dkt. No. 45-34 at 2 (SPD stating "Effective: January 1, 2020"), *with* Dkt. No. 45-5 at 3 (indicating corresponding insured received Observation services from Stony Brook in May 2021); *compare* Dkt. No. 45-37 at 2 (SPD stating "Effective: June 1, 2020"), *with* Dkt. No. 45-6 at 3 (indicating corresponding insured received Observation services from Stony Brook in January 2021). Only three of the excerpts Defendants submit appear to include a definition of "Plan Year" and, for each, that period begins and ends in the same calendar year. *See* Dkt. No. 45-34 at 12 ("**Plan Year**: January 1 - December 31"); Dkt. No. 45-35 at 10 (same); Dkt. No. 45-38 at 11 ("**Plan Year**: January 1 through December 1"). Excerpts from

Defendants contend that one Plan "[e]xplicitly permits assignments with written authorization from the [insured]."  Dkt. No. 45-24 at 9 (citing Dkt. No. 45-38 at 5-6).  But the cited portion of the excerpt indicates that it relates to out-of-network providers, not in-network providers like Stony Brook.  *See* Dkt. No. 45-38 at 5-6 ("How Are Covered Health Care Services from an Out-of-Network Provider Paid?").  And a separate three-sentence provision relating to in-network providers does not address assignment at all.  *Id.* at 5 ("How Are Covered Health Care Services from Network Providers Paid?").

Defendants' most precise characterization of the limited excerpts that they have submitted appears only in their ancillary papers, where they acknowledge that the balance of these excerpts either "do[ ] not address . . . assignments to in-network providers," Dkt. No. 45-24 at 2-5, 7, 10, or contain "[n]o provisions addressing assignment," *id.* at 8.  The Court agrees that the handful of pages Defendants have submitted do not contain provisions addressing assignment to in-network providers.  But these limited excerpts do not establish that any of the underlying Plans "permitted[,]" Dkt. No. 1 at ¶ 20, or "did not prohibit[,]" Dkt. No. 45 at 19, the assignment of ERISA claims to in-network providers at times relevant to Plaintiff's claims.  The Court thus agrees with Plaintiff that Defendants have not established a valid assignment from any of their insureds to Stony Brook.  Dkt. No. 47 at 3-5; *see also Murphy Med. Assocs., LLC v. Yale Univ.*, 120 F.4th 1107, 1113 (2d Cir. 2024) ("W[e] have made clear that providers cannot bring claims against ERISA health plans pursuant to this exception '[a]bsent a *valid* assignment of claim,' 'even if they have a direct stake in the outcome of the litigation.'") (quoting *McCulloch*, 857 F.3d at

---

another Plan appear to relate to services that are outside of the date range of the parties' dispute. Dkt. No. 45-8 at (indicating that Stony Brook provided services to Defendants' insured in May 2020 and billed Defendants for reimbursement in June 2020).  As a result, Defendants have not established that most of the excerpts they submit are applicable to the "exemplar claims" on which they rely.  Dkt. No. 45 at 19.

148); *Montefiore*, 642 F.3d at 327 ("A party seeking removal bears the burden of showing that federal jurisdiction is proper.") (citation omitted).

Further, as the Second Circuit has explained:

In *Montefiore Medical Center v. Teamsters Local 272*, an "in-network" hospital brought state-law claims against a union's employee benefit plan that was governed by ERISA. The hospital sought reimbursement for medical services that it had provided to beneficiaries of the plan. We found that the hospital's state-law claims were completely preempted by ERISA because, among other things, the hospital had received a valid assignment of the beneficiaries' right to payment and it was, therefore, the type of party that could bring its claim regarding benefits pursuant to § 502(a)(1)(B).

*McCulloch*, 857 F.3d at 146-47 (citing *Montefiore*, 642 F.3d at 324-25, 325-26, 328, 333). In determining that the assignments at issue were valid, the *Montefiore* panel examined the two contracts under which the plaintiff hospital provided in-network medical services to the defendant's insureds. *Montefiore*, 642 F.3d at 330. The first contract expressly permitted the hospital "to obtain payment (by billing or, if necessary, by suit) directly from patients in the event that [the plaintiff hospital] does not receive payment from the [defendant]." *Id.* The second contract was "silent as to whether [the plaintiff hospital] can seek full reimbursement directly from patients[.]" *Id.* As a result, the panel noted that "[w]e need not consider the question of whether a beneficiary can make a valid assignment to his in-network health care provider in the hypothetical situation in which the provider has expressly contracted *not* to seek full payment from the beneficiary." *Id.* at 330 n.9. The panel then declined to find either contract rendered invalid the assignments by defendant's insureds to the plaintiff hospital. *Id.* at 330. And the panel again clarified that, "[t]o be clear, our holding applies where a provider's contract with a PPO or ERISA benefit plan is silent regarding the question of whether the provider can hold the patient liable for unmet obligations, as in the case of [the second contract]." *Id.* at 330, n.10.

The contracts at issue here, however, are not silent. Instead, the Contracts appear to

expressly prohibit Stony Brook from seeking to hold a patient liable for unmet obligations.  Indeed, the "Customer 'Hold Harmless'" section of the United Contract states that "[Stony Brook] will not bill or collect payment from the Customer, or seek to impose a lien, for the difference between the amount paid under this Agreement and [Stony Brook]'s billed charge or Customary Charge, or for any amounts denied or not paid under this Agreement due to:" *inter alia* "Payment Policies[.]"  Dkt. No. 47-10 at 12, § 6.8.  Section 6.8 further states that "[t]his obligation to refrain from billing Customers applies even in those cases in which [Stony Brook] believes that United or Payer has made an incorrect determination.  In such cases, [Stony Brook] may pursue remedies under this Agreement against United or Payer, as applicable, but must still hold the Customer harmless."[8]  Dkt. No. 47-10 at 12, § 6.8.  Because the Contracts[9] expressly limit Stony Brook's ability to seek reimbursement from Defendants' insureds, the Court agrees with Plaintiff that this provides an additional reason why Defendants have not established that prong one, part one of *Davila* is satisfied.  Dkt. No. 47 at 4-5; *see also Montefiore*, 642 F.3d at 327.

As a result, the Court also agrees with Plaintiff that Defendants have failed to establish that Plaintiff's state law claims are completely preempted by ERISA.  Dkt. No. 47 at 5; *see also Plastic Surgery Grp., P.C. v. United Healthcare Ins. Co. of N.Y., Inc.*, 64 F. Supp. 3d 459, 465 (E.D.N.Y. 2014) ("Where both of *Davila*'s factors are satisfied—including the two sub-parts to *Davila*'s first prong—ERISA will preempt the state law claim.") (Bianco, J.) (citing *Arditi v. Lighthouse Int'l*,

---

[8] As discussed in further detail below, Defendants omitted this portion of Section 6.8 from the excerpt of the United Contract that they submitted.  *Compare* Dkt. No. 45-27 at 9, § 6.8, *with* Dkt. No. 47-10 at 12, § 6.8; *see also infra* Section IV.C.  This is an additional reason the Court is not persuaded that Defendants' excerpts constitute the relevant documentation.

[9] None of the excerpts submitted by Defendants indicate that they relate to a Plan administered by or insured by Oxford.  Dkt. Nos. 45-29, 45-30, 45-31, 45-32, 45-33, 45-34, 45-35, 45-36, 45-37, 45-38.  To the extent that the Oxford Contract is nonetheless relevant, it contains pertinent provisions similar to the United Contract, as detailed earlier.  *See supra* Section II.B.

676 F.3d 294, 299 (2d Cir. 2012)).  For the avoidance of doubt, however, the Court nonetheless proceeds with the *Davila* analysis.

### b.  Prong One, Part Two – Actual Claim

Part two requires that the Court determine "whether the *actual claim* that the plaintiff asserts can be construed as a colorable claim for benefits pursuant to § 502(a)(1)(B)." *McCulloch*, 857 F.3d at 146 (quoting *Montefiore*, 642 F.3d at 328).  "A colorable ERISA claim exists when the claim 'implicates coverage and benefit determinations as set forth by the terms of the ERISA benefit plan.'"  *Id.* at 149 (quoting *Montefiore*, 642 F.3d at 325).  Further, as the *Montefiore* panel made clear:

> [There is] a common distinction in the case law between claims involving the "right to payment" and claims involving the "amount of payment"—that is, on the one hand, claims that implicate coverage and benefits established by the terms of the ERISA benefit plan, and, on the other hand, claims regarding the computation of contract payments or the correct execution of such payments.  The former are said to constitute claims for benefits that can be brought pursuant to § 502(a)(1)(B), while the latter are typically construed as independent contractual obligations between the provider and the PPO or the benefit plan.

*Montefiore*, 642 F.3d at 331 (collecting cases).

Plaintiff alleges, and the parties' submissions confirm, that this is a billing dispute relating to the amount of reimbursement due under the Contracts.  *See, e.g.,* Dkt. No. 2 at ¶ 29 (Complaint alleging that "Defendants made a policy decision, beginning November 30, 2020, to not pay claims submitted for Observation services for stays of a duration of less than eight hours, despite the language in the Contracts requiring payment regardless of the length of stay."); Dkt. No. 45 at (Defendants arguing that ("[I]n or around October 1, 2020, United implemented a reimbursement policy called the [Policy]. . . . This Policy provides that Observation services must be reported with HCPCS code G0378 or G0379 on a single claim line with units that represent the hours in observation care[.]"); Dkt. No. 45-26 at 2, 3, 4 (Policy stating "*This reimbursement policy is*

24

*intended to ensure that you are reimbursed based on the code or codes that correctly describe the health care services provided. . . .* Observation services must be reported by facilities utilizing the following guidelines: . . . . Observation service code G0378 will only be considered for reimbursement when the observation period meets or exceeds 8 hours.") (emphasis added); Dkt. No. 22-1 at 121 (June 2023 correspondence stating that Defendants "implemented" the Policy and that "[c]laims for observation that do not align with the Observation Policy will be denied. The Provider has the option to resubmit the denied claim according to the terms of the Facility Participation Agreement between us (the 'Agreement') . . . . With the implementation of the Observation Policy, UnitedHealthcare is adopting certain CMS coding guidelines related to observation services, including that observation service code GO378 will only be considered for reimbursement when the observation period meets or exceeds 8 hours. . . . Denials of claims that don't meet the 8-hour requirement are consistent with Stony Brook's Agreement and applicable Payment Appendices, as well as support existing contractual obligations to code claims correctly."); Dkt. No. 22-2 at 13 (September 2024 correspondence stating that "United is writing to confirm that, between December 15, 2023 and December 15, 2026, Stony Brook [ ] will not be subject to the eight-hour requirement with respect to the following Payment Policy: Outpatient Hospital Observation Policy, Facility. Claims that have previously been processed as subject to this requirement shall be reprocessed by United."). Simply put, Plaintiff's claims concern "the computation of contract payments or the correct execution of such payments" and the "independent contractual obligations" between Stony Brook and Defendants. *Montefiore*, 642 F.3d at 331; *see also Platinum-Montaur*, 943 F.3d at 617.

Defendants nonetheless contend that that the purportedly assigned claims at issue[10] implicate ERISA benefits and thus the right to payment. *See, e.g.,* Dkt. No. 1 at ¶¶ 22-24; Dkt. No. 45 at 20-26. Defendants claim that because the Plans purportedly permitted them to implement the Policy, any denial of reimbursement to Stony Brook pursuant to the Policy effectively constituted a denial of insurance benefits to the insured under the applicable Plan. *See, e.g.,* Dkt. No. 45 at 22 ("Because the [ ] Plan gave United discretion to apply reimbursement policies . . . a claim line for an observation service of less than eight hours is not covered under the [P]lan."); *see also id.* at 10-11. The Court is not persuaded.

As an initial matter, the Court reiterates that the limited excerpts Defendants submit do not permit meaningful analysis of the documents from which they are taken, let alone the terms of the underlying Plans. *See supra* Section IV.B.1.a. For example, Defendants characterize the legal significance of various defined terms in these excerpts. *See, e.g.,* Dkt. No. 45 at 22 (discussing Dkt. Nos. 45-29, 45-34). But these terms appear to be defined in significant portions of the SPDs that Defendants have not provided. *Compare, e.g.,* Dkt. No. 45-29 at 10, 12 (glossary indicating that "**Covered Health Services**" are, *inter alia*, those "[d]escribed as a Covered Health Service in this SPD under Section 5, *Plan Highlights* and 6, *Additional Coverage Details*" and that "**Eligible Expenses**" are, *inter alia*, "as detailed in Section 3, *How the Plan Works*"), *with id.* at 3 (including a single page from one of the three referenced sections).

And even the limited excerpts Defendants have submitted do not support their position. Fundamentally, Defendants conflate whether a particular service is covered under a Plan with the correct reimbursement amount for a particular service under the Contracts. *See, e.g.,* Dkt. No. 45-

---

[10] As detailed above, of the nineteen purported assignments by Defendants' insureds, Defendants concede that nine are invalid and have failed to establish that any of the remaining ten are valid. *See supra* Section IV.B.1.a & n.5.

29 at 3 ("When Covered Health Services are received from a Network provider, Eligible Expenses are UnitedHealthcare's contracted fee(s) with that provider."); Dkt. No. 45-32 at 3 (same); Dkt. No. 45-34 at 3 (same); Dkt. No. 45-30 at 10 ("When Covered Health Services are received from In-Network Providers, Eligible Expenses are the contracted fee(s) with that Provider."); Dkt. No. 45-31 at 3 ("When Covered Health Services are received from a Designated Network and Network provider, Eligible Expenses are UnitedHealthcare's contracted fee(s) with that provider."); Dkt. No. 45-37 at 3 (same); Dkt. No. 45-36 at 4 ("When Covered Health Services are received from a Network provider, Eligible Expenses are the Claims Administrators' contracted fee(s) with that provider"). As such language makes clear, Plaintiff's allegations relate to the computation of "contracted fee(s)" under the Contracts, and thus the amount of payment, and not a determination of benefits under the Plans that implicates the right to payment. *Montefiore*, 642 F.3d at 331.

With respect to the latter, Defendants nonetheless submit a number of heavily excerpted so-called provider remittance advice forms (each, a "PRA"). But none of the excerpts Defendants submit "demonstrate[s that] Defendants denied payment for at least nine Observation services, billed through claim lines using code G0378, because the Observation services were not covered under the [P]lans." Dkt. No. 45 at 24 (citing Dkt. No. 45-24). For example, Defendants contend that "United determined that [a particular insured]'s claim was not covered under the [P]lan." *Id.* at 22 (citing Dkt. No. 45-24 at 6). Defendants submit three heavily redacted pages to support its position that "United denied any right to payment for the claim line" for this insured. *Id.* But the claim line that is visible indicates that the sole "CLM ADJ RSN CD" for adjusting Stony Brook's claim for reimbursement was United's determination that six hours of Observation services

27

constituted "CONTRACTUAL OBLIGATIONS - NON-COVERED CHARGES."[11] Dkt. No. 45-53 at 2, 4. In any event, this is one of the instances discussed above, where the SPD excerpt on which Defendants rely appears to relate to a different calendar year than the one in which Stony Brook provided services to the insured. *See supra* n.7; *compare* Dkt. No. 45-29 at 2 (SPD effective January 2020), *with* Dkt. No. 45-53 at 2 (services provided to corresponding insured in February 2021).

Defendants' discussion of a second insured suffers from the same issues. Dkt. No. 45 at 22. The claim line visible in the four heavily redacted pages Defendants submit also indicates that the sole "CLM ADJ RSN CD" for adjusting Plaintiff's claim for reimbursement was United's determination that three hours of Observation services constituted "CONTRACTUAL OBLIGATIONS - NON-COVERED CHARGE(S)."[12] Dkt. No. 45-52 at 2, 4. And the SPD excerpt on which Defendants rely again appears to relate to a different calendar year than the one in which Stony Brook provided services to the insured. *See supra* n.7; *compare* Dkt. No. 45-34 at 2 (SPD effective January 2020), *with* Dkt. No. 45-52 at 2 (services provided to corresponding insured in May 2021).

Claim lines visible on the balance of the PRAs on which Defendants rely list the same adjustment reason code. Dkt. No. 45-45 at 2, 7; Dkt. No. 45-46 at 3, 5; Dkt. No. 45-47 at 2, 3; Dkt. No. 45-48 at 2, 6; Dkt. No. 45-49 at 2, 4; Dkt. No. 45-50 at 2, 4; Dkt. No. 45-51 at 2, 6.

These documents thus indicate that Defendants adjusted Plaintiff's claims for

---

[11] This excerpt's pagination indicates that it is taken from a larger document with at least 248 pages. *See generally* Dkt. No. 45-53. The coding in the separate "REMARK/NOTES" column on which Defendants rely similarly indicates "Not Eligible Charge." *Id.* 45-53 at 2, 4.

[12] This excerpt's pagination indicates that it is taken from a larger document with at least 218 pages. *See generally* Dkt. No. 45-52. The coding in the separate "REMARK/NOTES" column on which Defendants rely similarly indicates "Not Eligible Charge." *Id.* at 2, 4.

reimbursement based on Defendants' interpretation of the Contracts, and not because Defendants had denied ERISA benefits to individuals being treated in Stony Brook's emergency room. Accordingly, the Court finds that Defendants have not established that the claims at issue involve the denial of ERISA benefits, as opposed to the amount of reimbursement due under the Contracts. *Montefiore*, 642 F.3d at 331.  As noted earlier, the parties' prelitigation correspondence similarly indicates that interpretation of the Contracts, and not any Plan, was at issue.  *See supra* Section II.C.

Defendants also argue that benefit determinations are at issue because the Contracts only provide for reimbursement of services that are covered under a Plan, which thus requires interpretation of that Plan.  *See, e.g.,* Dkt. No. 1 at ¶¶ 22-23; Dkt. No. 45 at 21-22.  As just discussed, however, Defendants have failed to establish that coverage for emergency room Observation services was actually denied under any Plan.

For all of these reasons, the Court agrees with Plaintiff that "the basis for the Defendants' liability does not involve a coverage or benefits determination, and it is not derived from the terms of the plan documents [and does not] call upon the Court to construe or apply plan provisions." Dkt. No. 22-3 at 22.  Because Defendants have not demonstrated that prong one, part two of *Davila* is satisfied, this provides an independent reason why Defendants have failed to establish that Plaintiff's state law claims are completely preempted by ERISA.  *United Healthcare*, 64 F. Supp. 3d at 465.  For the avoidance of doubt, however, the Court nonetheless proceeds with the *Davila* analysis.

### 2. *Davila* Prong Two – Other Independent Legal Duty

Under the second prong of *Davila*, "a claim is completely preempted only if 'there is no other independent legal duty that is implicated by [the] defendant's actions.'  The key words here

29

are 'other' and 'independent.'"  *McCulloch*, 857 F.3d at 150 (alteration in original) (first quoting *Montefiore*, 642 F.3d at 332; and then citing *id.* at 328).

Plaintiff's primary argument is that its claims arise from Defendants' obligations under the Contracts and state law, and not from any Plan.  Dkt. No. 22-3 at 23-24.  Defendants concede that "at least some of Plaintiff's claims implicate [an] independent legal duty" and go on to argue that "[t]he Court should exercise supplemental jurisdiction over all claims that do not themselves meet the requirements of the *Davila* test."  Dkt. No. 45 at 28 (citations omitted).  The two causes of action that Defendants do not explicitly address in their opposition to the Motion are based on New York state statutes.  *Compare* Dkt. No. 2 at ¶¶ 46-56 (Plaintiff's third and fourth statutory causes of action), *with* Dkt. No. 45 at 26-27 (discussing Plaintiff's first and second common law causes of action).  Based on Defendants' concession, the Court finds that they have failed to demonstrate that prong two of *Davila* is satisfied.

Even without this concession, Defendants' arguments on this prong largely rely on their earlier arguments, and fail for similar reasons.  *See generally* Dkt. No. 45 at 26-27.  As previously discussed, Defendants have not established that any "exemplar claim" involves the denial of ERISA benefits to Defendants' insureds.  *See supra* Section IV.B.1.b.  Moreover, the parties' submissions support Plaintiff's contentions that Defendants adjusted the amount of reimbursement due to Stony Brook as a result of the Policy, and not any Plan.  *Id.*

For purposes of removal, the Court finds that all of Plaintiff's claims implicate legal duties other and independent from the Plans, including legal duties arising under the Contracts.  Because Defendants have not demonstrated that prong two of *Davila* is satisfied, this provides another independent reason why Defendants have failed to establish that any of Plaintiff's state law claims

30

are completely preempted by ERISA.[13]  *Wurtz*, 761 F.3d at 243 (finding that plaintiff's claims under New York state statute did not satisfy prong two of *Davila*).

### C.  Just Costs and Actual Expenses

Pursuant to Section 1447(c), "[a]n order remanding the case may require payment of just costs and actual expenses, including attorney fees, incurred as a result of the removal."  28 U.S.C. § 1447(c).  The Second Circuit has noted the Supreme Court's guidance on this issue:

> Absent unusual circumstances, courts may award attorney's fees under § 1447(c) only where the removing party lacked an objectively reasonable basis for seeking removal.  Conversely, when an objectively reasonable basis exists, fees should be denied.  In applying this rule, *district courts retain discretion to consider whether unusual circumstances warrant a departure from the rule in a given case*.

*City of New York*, 154 F.4th at 46-47 (quoting *Martin v. Franklin Cap. Corp.*, 546 U.S. 132, 141 (2005)).  Accordingly, "a district court retains discretion to award fees in 'unusual circumstances,' even where an objectively reasonable basis for removal existed."  *Id.* at 47.  As the Second Circuit has further explained, a district court's "reasons for departing from the general rule should be 'faithful to the purposes' of awarding fees under § 1447(c)."  *Id.* (quoting *Martin*, 546 U.S. at 141).  And with respect to these purposes:

> Congress thought fee shifting appropriate in some cases.  The process of removing a case to federal court and then having it remanded back to state court delays resolution of the case, imposes additional costs on both parties, and wastes judicial resources.  Assessing costs and fees on remand reduces the attractiveness of removal as a method for delaying litigation and imposing costs on the plaintiff.  The appropriate test for awarding fees under § 1447(c) should recognize the desire to deter removals sought for the purpose of prolonging litigation and imposing costs on the opposing party, while not undermining Congress' basic decision to afford defendants a right to remove as a general matter, when statutory criteria are satisfied.

---

[13] Defendants' untimely request to file a lengthy sur-reply, Dkt. No. 48, is denied, both under the Local Rules, *see* N.D.N.Y. L.R. 7.1(a), and for numerous reasons set forth by Plaintiff, *see generally* Dkt. No. 49.

*Id.* (quoting *Martin*, 546 U.S. at 140).

Plaintiff requests just costs and actual expenses, including attorney's fees. Dkt. No. 22 at 1; Dkt. No. 22-3 at 24. Defendants oppose, based on "their reasonable decision to remove the case to federal court based on complete ERISA preemption"[14] and because "[a]s cited in Defendants' Notice of Removal and in this brief, there are many examples of courts in this District exercising jurisdiction in similar circumstances[.]" Dkt. No. 45 at 28.

Defendants' second argument fails. Defendants cite no cases from this District at all, let alone any presenting purportedly "similar circumstances." *See generally* Dkt. Nos. 1, 45.

Defendants' first argument also fails. Whether Defendants are correct that they had some unspecified "reasonable basis" for removal, neither their Notice nor their arguments since provide any "objectively reasonable basis" for doing so. *See Tamm Consulting v. Cincinnati Ins. Co.*, No. 18-cv-11415, 2020 WL 1144713, at *4 (S.D.N.Y. Mar. 9, 2020) ("A basis for removal is objectively reasonable if the removing party had a colorable argument that removal was proper.") (citation omitted).

Defendants' Notice does not provide a colorable argument that all portions of *Davila* are satisfied. *Wurtz*, 761 F.3d at 241. Therein, Defendants acknowledged that "Plaintiff's Complaint does not cite or reference *a single* Customer Benefit Plan," but claimed that "United has been able to identify a subset of these plans." Dkt. No. 1 at ¶¶ 9-10. Defendants represented that "[a] sample such an [sic] ERISA Plan is attached[.]" *Id.* at ¶ 11. For the same reasons as those detailed above, Defendants have not established that these limited excerpts constitute the Plan or its relevant terms, in part because these excerpts explicitly reference numerous other documents that Defendants have

---

[14] Consistent with Defendants' argument, the Court notes that the Notice articulates no basis for federal jurisdiction other than complete preemption under ERISA. *See generally* Dkt. No. 1.

not provided. *See supra* Section IV.B.1.a; *see also* Dkt. No. 1-3.

Based on these excerpts, the Notice nonetheless claimed that Defendants' insureds "were contractually permitted to assign their benefits to SBUH" and that the excerpts Defendants submitted provided one example of such express permission. Dkt. No. 1 at ¶ 20. As detailed above, however, the language Defendants cite[15] indicates that it relates to out-of-network providers, not in-network providers like Stony Brook. *See supra* Section IV.B.1.a. The Notice further represented that "[w]ith this contractual authorization, ERISA Plan Participants under this plan and others, did in fact assign their ERISA benefits to SBUH." Dkt. No. 1 at ¶ 20. But Defendants have still not established that any Plan, including this one, "contractually permitted" assignment. *See supra* Section IV.B.1.a. In fact, Defendants now argue only that the Plans "did not prohibit" such assignment. Dkt. No. 45 at 19. For all the reasons stated previously, that assertion remains unsupported. *See supra* Section IV.B.1.a. As a result, the Court finds that Defendants' Notice (as well as their arguments since) have failed to provide a colorable argument that prong one, part one, of *Davila* could be satisfied.

As to prong one, part two, the Notice contended only that:

> [ ] Some courts in this Circuit have further assessed *Davila* Prong 1 by examining the plaintiff's standing to pursue an ERISA claim and inquiring whether the assigned claims are the type of claim that can be pursued under § 502(a)(1)(B). "A right to payment claim is a colorable ERISA claim and exists when the claim 'implicate[s] coverage and benefit determinations as set forth by the terms of the ERISA benefit plan.'["] . . . .
>
> [ ] Although this inquiry into standing is not necessary or appropriate under *Davila*, here, the Action will significantly focus on coverage determinations, specifically, whether Observations lasting less than eight hours constituted 'Covered Services' under the applicable Customer Benefit Plans, including the ERISA Plans.

---

[15] While the excerpt Defendants attached to their Notice contain fewer pages than the excerpt attached to their opposition to the Motion, both versions include this language. *Compare* Dkt. No. 1-3 at 4-5, *with* Dkt. No. 45-38 at 5-6.

[ ]    Therefore, *Davila* Prong 1 is satisfied, and the analysis proceeds to *Davila* Prong 2.

*Id.* at ¶¶ 22-24 (second alteration in original) (citations omitted).  Defendants' contention that assessing part two of prong one "is not necessary or appropriate under *Davila*" is wrong as a legal matter.  Indeed, as Defendants acknowledge in their opposition to the Motion:

> Under binding precedent, ERISA completely preempts a provider's claims for payment when (1) the provider has obtained valid assignments from patients for claims governed by ERISA benefit plans, *(2) the claims involve the right to payment, rather than the amount of payment,* and (3) the provider has no other, independent source of rights.

Dkt. No. 45 at 6-7 (emphasis added) (first citing *Montefiore*, 642 F.3d at 328-29; and then citing *Davila*, 542 U.S. at 210); *see also McCulloch*, 857 F.3d at 149.

The Notice's misstatement of law is compounded by the fact that the Notice did not argue that any of the supposedly relevant "coverage determinations" actually resulted in the denial of ERISA benefits to Defendants' insureds.  *See generally* Dkt. No. 1.  Defendants asserted that their investigation had identified a Plan relevant to the parties' dispute and a purported assignment of ERISA benefits under that Plan by a specific insured, and attached excepts purportedly related to each.  *Id.* at ¶¶ 10-12; Dkt. Nos. 1-3, 1-4.  But Defendants did not attach any denial of benefits to that insured, nor did they argue that the insured (or any other insured) had been denied ERISA benefits.  *See generally* Dkt. No. 1.  As for the heavily redacted materials Defendants have since submitted, these indicate that Defendants adjusted Plaintiff's claims for reimbursement pursuant to the Policy, not that Defendants denied benefits to any of their insureds who were evaluated in the emergency room for admission to Stony Brook.  *See supra* Section IV.B.1.b; *see also* Dkt. No. 45 at 8.  As a result, the Court finds that Defendants' Notice (as well as their arguments since) failed to provide a colorable argument that prong one, part two, of *Davila* could be satisfied.

34

With respect to prong two, the Court finds the arguments in Defendants' Notice, and since, similarly deficient. *See also supra* Section IV.B.2.

For each of these reasons, the Court finds that Defendants had no objective basis for removing this action, and that just costs and actual expenses are appropriate under Section 1447(c). *City of New York*, 154 F.4th at 46-47; *see also McCulloch*, 857 F.3d at 146 ("The *Davila* test is conjunctive—a state-law claim is completely preempted by ERISA only if both prongs of the test are satisfied.") (citing *Montefiore*, 642 F.3d at 328).

In the alternative, the Court finds that the unusual circumstances of this case support the award of just costs and actual expenses under Section 1447(c).

As the Court has noted, Defendants have repeatedly submitted selective excerpts and inaccurately characterized many of those excerpts to support their arguments. *See supra* Section IV.B. Notably, while Plaintiff's central allegation is that Defendants' denied reimbursement in breach of the United Contract and the Oxford Contract, Defendants did not attach any portion of the Contracts to the Notice. *See generally* Dkt. No. 1. Several months later, Defendants submitted limited excerpts of the Contracts in connection with another motion. Dkt. Nos. 23-2, 23-3. Plaintiff objected to the submission of only these limited excerpts, stating:

> [T]he original full and complete Contracts should be submitted for review instead of the excerpts of said Contracts to provide the Court with the full context of said Contracts. . . . Plaintiff intends . . . to cite other sections of the Contracts that are relevant . . . . [and] the Court will need to examine additional provisions that the Defendants have opted to exclude from their exhibits.
>
> . . . .
>
> . . . Plaintiff requested that Defendants voluntarily agree to replace the excerpted versions of the Contracts with the original full and complete Contracts. Defendants have refused, citing vague "confidentiality concerns".
>
> . . . .

> . . . Defendants have not provided any explanation as to why sealing the complete Contracts, instead of excerpts, would raise "confidentiality concerns" or how the "confidentiality concerns" would be contrary to the need to seal the documents.

Dkt. No. 34 at ¶¶ 5, 7, 8. Defendants responded that "Defendants oppose Plaintiff's request that Defendants be ordered to supplement their . . . exhibits to include additional pages from the Network Contracts. If Plaintiff deems it necessary to provide additional pages of the Network Contracts to the Court, Plaintiff should attach those pages to its [briefing.]" Dkt. No. 35 at 2.

Several months later, Defendants resubmitted with the Motion similarly limited excerpts from the United Contract and the Oxford Contract. Dkt. No. 45-27 (thirteen-page excerpt); Dkt. No. 45-28 (five-page excerpt). Plaintiff then resubmitted complete versions of each Contract. Dkt. No. 47-9 at ¶ 3; Dkt. No. 47-10 (seventy-page document); Dkt. No. 47-11 (sixty-four-page document). As described above, the Contracts contain provisions relevant to the resolution of the issues before the Court. *See supra* Sections II.B, IV.B.1.a. Moreover, the format of the United Contract that Plaintiff submits suggests that Defendants provided excerpts from a version of that Contract with different formatting, different text at the bottom of the pages, different pagination, and different page breaks. *Compare* Dkt. No. 45-27 at 2-14, *with* Dkt. No. 47-10 at 2-20. As a result, the excerpts Defendants submitted do not contain the entirety of Section 6.8, including portions cited above. *See supra* Sections II.B, IV.B.1.a.

Finally, the Court notes the relatively narrow factual universe central to this dispute: Plaintiff's reimbursement request for a few hundred claims for a single type of healthcare service that an emergency room provider, in the same state as Defendants, provided to Defendants' insureds between November 30, 2020 and December 14, 2023. *See generally* Dkt. No. 2. In short, investigation of the relevant facts here appears relatively straightforward and, in any event, Defendants had ample time to conduct such an investigation prior to filing a notice of removal in

36

January 2025. Dkt. No. 1 at ¶¶ 1, 10-12. Indeed, back in 2023, Plaintiff and Defendants corresponded regarding disputed reimbursement claims, apparently with the result that Defendants "reprocessed" approximately nine months of reimbursement claims "that have previously been processed as subject to" "the eight-hour requirement with respect to the [Policy]." Dkt. No. 22-2 at 13. The parties have now spent more than a year litigating in federal court, during which time Defendants requested jurisdictional discovery in response to Plaintiff's Motion. *See supra* Section II.E. But the key documents here—the Contracts and Plans—were already in Defendants' possession prior to any discovery, as Plaintiff has noted. Dkt. No. 47-1 at ¶ 5 (stating that "Defendants were *in possession* of the policy and coverage information" prior to discovery). Substantial time and additional costs have nonetheless been spent litigating the factual basis for Defendants' position, which remains unsupported. *See generally* Dkt. No. 1.

Moreover, Defendants have requested numerous extensions of time during the pendency of this litigation. *See, e.g.,* Dkt. Nos. 8, 15, 19, 27. Defendants have also forced Plaintiff to litigate numerous unnecessary issues, including jurisdictional discovery, *see, e.g.,* Dkt. No. 29 at 2 ("[T]here is no colorable ERISA claim because the case does not implicate coverage and benefit determinations as set forth by the terms of the ERISA benefit plan, and resultingly, Defendants cannot meet one of the required elements of the test for ERISA preemption set forth in [*Davila*]. Defendants seek jurisdictional discovery pertinent to a separate prong of the *Davila* test, to determine whether [Plaintiff] is a proper party to bring a direct claim pursuant to ERISA. However, Defendants' failure to meet one prong of the test makes remand proper because all of the prongs of the *Davila* test must be met for the claims to be preempted. . . . As a result, Defendants' requested discovery is not necessary and should be denied.") (citing *Wurtz*, 761 F.3d at 243); whether complete versions of relevant documents should be submitted for a court's review,

37

Dkt. No. 34 at ¶¶ 5-10; and whether a sur-reply should be permitted, *see supra* n.13.

As a result, the Court finds that the unusual circumstances of this particular case also weigh in favor of awarding Plaintiff costs and expenses. *See, e.g., City of New York*, 154 F.4th at 47 ("The process of removing a case to federal court and then having it remanded back to state court delays resolution of the case, imposes additional costs on both parties, and wastes judicial resources. Assessing costs and fees on remand reduces the attractiveness of removal as a method for delaying litigation and imposing costs on the plaintiff.") (quoting *Martin*, 546 U.S. at 140).

For all of these reasons, the Court grants Plaintiff's request for costs and actual expenses, including attorney's fees, pursuant to 28 U.S.C. § 1447(c).

## V.    CONCLUSION

The Court grants the Motion and remands this action to New York State Supreme Court, Albany County, pursuant to 28 U.S.C. § 1447(c) for lack of subject matter jurisdiction.[16]

Accordingly, the Court hereby

**ORDERS** that Defendants' motions to seal, Dkt. Nos. 24, Dkt. No. 46, are **GRANTED**; and the Court further

**ORDERS** that Defendants' motion to file a sur-reply, Dkt. No. 48, is **DENIED**; and the Court further

**ORDERS** that Plaintiff's motion to remand, Dkt. No. 22 is **GRANTED**; and the Court further

**ORDERS** that this action is **REMANDED** to New York State Supreme Court, Albany County; and the Court further

**ORDERS** that the parties remaining pending motions, Dkt. Nos. 23, 29, are

---

[16] All pending motions not explicitly addressed herein are terminated as moot. Dkt. Nos. 23, 29.

38

**TERMINATED**; and the Court further

ORDERS that the Clerk serve a copy of this Memorandum-Decision and Order on the

parties in accordance with the Local Rules, and close this case.

**IT IS SO ORDERED.**

Dated: March 31, 2026
      Albany, New York

Anne M. Nardacci
U.S. District Judge